| | | |
|---|---|---|
| **MARTIN RODRIGUEZ OLIVARES,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | |
| **NANCY A. BERRYHILL,** | § | **SA-16-CA-1220-XR** |
| **Commissioner of the Social** | § | |
| **Security Administration,** | § | |
| | § | |
| **Defendant.** | § | |

## ORDER

On this date, the Court considered the Report and Recommendations (docket no. 15) filed by the Magistrate Judge in this appeal of the denial of an application for disability insurance benefits, and the objections (docket no. 18) thereto. After careful consideration, the Court will remand this case to the Commissioner for further proceedings as discussed herein.

### <u>Administrative Proceedings</u>

Based on the record in this case, Plaintiff fully exhausted his administrative remedies prior to filing this action in federal court. Plaintiff filed for disability insurance benefits on February 12, 2013, alleging disability beginning November 16, 2012, with the following alleged impairments: sleep apnea, problems with both knees, chronic lower back problems, both shoulder problems, carpal tunnel, cervical problems, depression, hypertension, problems with both ankles, hearing in both ears, prostate problem. Tr. 100. The record indicates that Plaintiff worked steadily until late 2012, and does not clearly indicate what caused Plaintiff to stop working.

On April 23, 2013, Dr. William Green conducted an independent consultative medical exam. Dr. Green noted some of Plaintiff's complaints, indicating knee, back, and neck pain, carpal

tunnel syndrome, hypertension, right and left ankle pain, bilateral hearing loss, prostate cancer, and sleep apnea. Tr. 462. Dr. Green discussed Plaintiff's functional abilities, noting that he could shop, travel, prepare a simple meal, complete personal hygiene activities, and drive without assistance. Tr. 462. Plaintiff reported memory loss, depression, and anxiety. Tr. 463. Dr. Green noted that Plaintiff admitted depression, changes in energy level, and changes in sleeping habits, but Dr. Green did not otherwise appear to consider Plaintiff's mental impairments.

In the "History of Present Illness," Dr. Green states that Plaintiff was mustered out of the military "because of the sleep apnea" and later states "[he] has added sleep apnea and uses a CPAP machine with good result." Tr. 462. The notes also state that Plaintiff "can ambulate without the use of an assistive device," that he denied the use of a cane, and that he was not using an assistive device on examination. Tr. 462-63. He reported a normal gait and station, with no unsteadiness. Tr. 464. The report notes that Plaintiff was "[a]ble to hear and understand normal conversational voices with the use of bilateral hearing aids." Tr. 463. In the assessment/plan, he includes: "Bilateral hearing loss from noise exposure. Wears hearing aids with good result" and "Sleep apnea treated with CPAP." Tr. 464.

On April 30, 2013, Plaintiff was evaluated by Dr. Sean Connolly, Ph.D., who conducted a clinical interview and mental status exam. Tr. 468-69. Dr. Connolly reported that Plaintiff "acknowledged some depression" with symptoms, had seen a psychiatrist, and was currently taking Fluoxetine and had taken Diazepam, which he started about a year prior. Tr. 472. He also reported that Plaintiff has participated in group therapy and a five-session pain management program, and had been complaining about pain for four years. Tr. 472. After reviewing the mental status exam results and some of Plaintiff's medical records, Dr. Connolly formed diagnostic impressions for "Pain Disorder associated with psychological factors and a general medical

condition" and "depressive disorder NOS." Tr. 474. He assigned a current GAF score of 55, indicating "mild difficulties in social and occupational functioning." *Id*. His functional assessment noted that Plaintiff takes care of his own grooming, dressing, and hygiene, can pay bills, buy groceries, can cook a simple meal, and can go to the store on his own. Tr. 474. He did not conduct a specific mental RFC analysis for occupational functioning.

Based on the consultative exams and Plaintiff's submitted records, the Commissioner denied the application initially on June 12, 2013 and on reconsideration on August 13, 2013. The initial consultant/examiner considered that Dr. Green had noted that Plaintiff was able to perform activities of daily living without assistance, and that Plaintiff's MRI of his lumbar spine showed degenerative changes and knee x-rays showed slight narrowing of joint space in the left knee. Tr. 103. The consultant found severe disorders of the back and severe affective disorders. Tr. 104. The consultant performed the psychiatric review technique[1] and considered the criteria for Listing 12.04 (affective disorders), finding that Plaintiff had mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. Tr. 104. The consultant noted that "alleged limitations are not fully supported by mer [medical evidence of record]," "[a]lleged severity of condition partially supported by MER and other evidence in file," and "[a]llegations somewhat credible but limitations are not disabling." Tr. 105, 107.

The consultant found that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk about 6 hours in an 8-hour work day, and sit about 6 hours in an 8-hour work day, and had some limitations on stooping and crouching. Tr. 106. The mental RFC included

---

[1] The regulations require the Commission to complete a standard document to record how they applied the psychiatric review technique at the initial and reconsideration levels. 20 C.F.R. § 404.1520a(e).

certain limitations on understanding and memory (moderate limitations on ability to understand and remember detailed instructions), limitations on sustained concentration and persistence (moderate limitations on ability to carry out detailed instructions, moderate limitations on ability to maintain attention and concentration for extended periods), and certain limitations on social interaction (moderate limitations on ability to accept instructions and respond appropriately to criticism from supervisors). Tr. 107-108. Despite these noted limitations, the "additional explanation" for the mental RFC states, "Claimant able to understand, remember and carry out detailed but not complex instructions, make basic decisions, concentrate for extended periods, interact with others and respond to changes." Tr. 108. The examiner concluded that Plaintiff could do his past relevant work as a delivery driver and was not disabled. Tr. 109.

On reconsideration, the consultant's psychiatric review technique added Listing 12.07 for somatoform disorders to the Listing 12.04 for affective disorders, and noted "has dx from VA TS of depression and pain disorder; rx fluoxetine, had a course of group therapy to address pain issues." Tr. 117. The Fifth Circuit has recognized that "[t]he basic feature of somatoform disorders is the presence of physical symptoms for which there are no demonstrable organic findings," such that pain and other symptoms may exist as a result of such a disorder rather than physical impairments. *Latham v. Shalala*, 36 F.3d 482, 484 (5th Cir. 1994). In addition, the regulations recognize that mental impairments "may also limit exertional capacity by affecting one or more of the seven strength demands." SSR 96-8p.

The consultant's psychiatric review technique again included mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. 117. The consultant noted "no current txt or hospitalizations due to mental allegations" and that the "allegations are partially supported by

EOR." Tr. 116. The "additional explanation" states that "EOR is convergent w sx [symptoms] reasonably associated with MDI's [medically determinable impairments]. Sx may restrict the clmt somewhat but would not wholly compromise. SEE MRFC." Tr. 117-18. The consultant also noted that one or more of the individual's medically determinable impairments could reasonably be expected to produce his pain or other symptoms, but that his statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence alone. Tr. 118.

The physical RFC found that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk about 6 hours, and sit about 6 hours, with limits on stooping or crouching. Tr. 119. The mental RFC was the same as on initial consideration, with limitations in understanding/memory, concentration/persistence, and social interactions. Tr. 121-22. The examiner again concluded that Plaintiff could do his past relevant work as a delivery driver and was not disabled. Tr. 123.

Plaintiff then asked for a hearing. A hearing was held before the ALJ on January 21, 2015. Plaintiff testified, and testimony was also heard from a vocational expert ("VE"). The ALJ issued a decision on March 17, 2015, concluding that Plaintiff is not disabled because he could perform his past relevant work as a lawn care foreman. The ALJ recognized the opinions of the state agency psychological consultants at the initial (Dr. Reddy) and reconsideration (Dr. Wilson) stages, as well as Dr. Connolly's opinion, but after conducting the psychiatric review technique himself found that Plaintiff's depressive disorder was not severe and that "claimant made no mental claim at the hearing." Tr. 131, Tr. 133. He assigned Plaintiff a physical RFC to perform light work with some limitations, and found no limitations to his mental RFC. Tr. 134.

Plaintiff requested review, and the SSA Appeals Council vacated the ALJ's decision and

remanded to the ALJ for resolution of the following issues: (1) the decision did not contain an adequate evaluation of the treating source opinions of Dr. Glenn Whitten and his opinions from October and November 2012 concerning limitations on Plaintiff's abilities, and (2) the decision found that Plaintiff could perform his past relevant work as a lawn care foreman, but Plaintiff's records did not show any income from the company that the claimant reported working at in his work history report. Tr144.[2]

The Appeals Council provided detailed instructions on remand, including to "[o]btain updated and additional evidence concerning the claimant's impairments in order to complete the administrative record" including, if warranted, "consultative physical and psychological examinations and medical source statements about what the claimant can still do despite the impairments"; "further evaluate the claimant's mental impairments in accordance with the special technique described in 20 C.F.R.1520a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1420a(c)"; give further consideration to Plaintiff's maximum RFC with specific references to evidence of record in support of assessed limitations and, in so doing, evaluate treating and nontreating source opinions appropriately and explain the weight given; and "further evaluate the claimant's ability to perform past relevant work at Step 4 . . . and make appropriate findings in accordance with the regulations regarding . . . the specific physical and mental demands of this work for comparison with the claimant's residual functional capacity." Tr. 145.

---

[2] The Appeals Council noted Plaintiff's treating physician's (Dr. Whitten) opinions that in November 2012 Plaintiff "was limited to no lifting over 15 pounds, bending, stooping, twisting, or standing or walking over 15 minutes per hour" and that Plaintiff "needed sedentary work as he could not stand or walk over 4 hours per day." Tr. 144. In October 2012, when assessing the restrictions, Dr. Whitten noted that Plaintiff had intermittent low back pain since 2000 and constant cervical pain since 2005 due to degenerative disc disease, that his condition had been gradually progressive over the last seven years, and that he had little improvement with multiple epidural steroid injections. Tr379. In November 2012, he recommended restrictions on bending, lifting, standing, stooping, twisting, standing, or walking "as these cause worsening of Mr. Olivares' pain." Tr. 356.

The ALJ held a second administrative hearing on December 16, 2015. Plaintiff testified, and testimony was heard from a different VE. Plaintiff amended his disability onset date to December 21, 2012. Tr. 73. The ALJ issued a second unfavorable decision on March 25, 2016, again finding that Plaintiff could do his past relevant work as a lawn care foreman. The ALJ's mental RFC analysis was largely the same as his prior analysis. He noted that "the Remand Order requested a further evaluation of claimant's mental impairments, and this has been done to some extent" but stated it "would have been helpful if the Appeals Council would have explained what, if anything, needed to be done to satisfy any alleged shortcomings here." Tr. 20.

The Appeals Council denied review of the decision on October 4, 2016, and the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g). Plaintiff filed this lawsuit seeking review on December 1, 2016.

## Standard of Review

In reviewing the Commissioner's decision denying disability benefits, the reviewing court is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards in evaluating the evidence. *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (quoting *Hames*, 707 F.2d at 164).

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed. *Martinez*, 64 F.3d at 173. In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see also Villa*, 895 F.2d at 1021 (the court is not to reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner). Conflicts in the evidence and credibility assessments are for the Commissioner and not for the courts to resolve. *Martinez*, 64 F.3d at 174.

### Evaluation Process and the ALJ's findings

Every individual who is insured for disability benefits, has not reached retirement age, meets certain income and resource requirements, has filed an application for benefits, and is under a disability, is eligible to receive DIB. 42 U.S.C. § 423(a)(1). The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

Regulations set forth by the Commissioner prescribe that disability claims are to be evaluated according to a five-step process. 20 C.F.R. §§ 404.1520 and 416.920. The claimant bears the burden of proof at the first four steps of the sequential analysis. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). A finding that a claimant is disabled or not disabled at any point in the process is conclusive and terminates the Commissioner's analysis. *Id.*

The first step involves determining whether the claimant is currently engaged in substantial gainful activity. If so, the claimant will be found not disabled regardless of his medical condition

or his age, education, or work experience. At step one, the ALJ determined Plaintiff had not engaged in substantial gainful activity since December 21, 2012, the amended alleged disability onset date. Tr. 16.

The second step involves determining whether the claimant's impairment is severe. If it is not severe, the claimant is deemed not disabled. An impairment can be considered as not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985). At step two, the ALJ determined that Plaintiff has the following severe physical impairments: back problems (degenerative disk disease); obstructive sleep apnea ("OSA"); prostate cancer; carpal tunnel syndrome ("CTS"); hearing loss; and degenerative joint disease of the bilateral knees. Tr. 16. He found that Plaintiff's hypertension was a non-severe impairment, and he also considered the Plaintiff's elevated weight and obesity but found it had not caused any more than minimal functional deficits and was not severe.

The ALJ did not find any severe mental impairments. In assessing mental impairments, the ALJ must apply a special technique to determine severity. Under the regulations applicable at the time of the ALJ's decision, if a mental impairment is found, the ALJ evaluates the degree of functional loss resulting from the impairment in four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *Andrews v. Austin*, 917 F. Supp. 2d 624, 633 n.2 (N.D. Tex. 2013). [3] "Concentration, persistence, or pace" refers to "the ability to sustain focused attention sufficiently long to permit the timely completion of tasks commonly found in work settings." *Acosta v. Astrue*,

---

[3] The special psychiatric review technique was amended effective March 27, 2017.

865 F. Supp. 2d 767, 787 (W.D. Tex. 2012). The degree of limitation in the first three areas is rated on a five-point scale including none, mild, moderate, marked, and extreme. *Id.* If the ALJ rates the degree of limitation in the first three functional areas as "none" or "mild" and finds no episodes of decompensation, the mental impairment will generally be found not severe, unless the evidence otherwise indicates that there is more than a minimal limitation on the claimant's ability to do basic work activities. *Id.* n.5.

Although the state agency psychological consultants had found Plaintiff to have a severe affective disorder (depression), the ALJ found that Plaintiff's medically determinable mental impairment of depressive disorder was not severe because Plaintiff had no limitations in activities of daily living and maintaining social functioning, was only mildly limited in concentration, persistence or pace, and had no episodes of decompensation. Tr. 18. Plaintiff does not directly challenge the ALJ's severity determination,[4] but argues that the state agency consultants and examining psychologist (Dr. Connolly) each opined that Plaintiff's depression materially limits his ability to perform work activities, and argues that the ALJ's ultimate mental RFC determination of zero limitations is not supported by substantial evidence. Docket no. 10 at 6. Plaintiff also notes that although the ALJ noted the diagnosis of "pain disorder associated with psychological factors," a mental impairment, he did not classify it as severe or nonsevere, and did not include it anywhere in his analysis, making it impossible to determine on review if and how it was considered in the ALJ's determination.

In the third step, the Commissioner compares the severe impairment(s) with those on a list

---

[4] The Court questions whether the ALJ applied the correct severity standard. *See Padalecki v. Astrue*, 688 F. Supp. 2d 576 (W.D. Tex. 2010) (Rodriguez, J.). *But see Acosta v. Astrue*, 865 F. Supp. 2d 767, 779-80 (W.D. Tex. 2012) (disagreeing with *Padalecki*). *See also Mills v. Berryhill*, No. 4:16-CV-0331-Y-BL, 2017 WL 3972009, at *4 (N.D. Tex. Aug. 3, 2017) (noting "significant judicial disagreement" on whether the standard in the regulations complies with *Stone v. Heckler* and concluding that the minimal effect standard of the regulations satisfies *Stone*).

of specific impairments. If it meets or equals a listed impairment, the claimant is deemed disabled without considering his age, education, or work experience. The ALJ considered the physical impairments he found severe at Step 2, and found that Plaintiff's impairments did not meet or equal a listed impairment. Tr. 20-21. Plaintiff does not challenge that finding.

If no listing is met, the Commissioner, in the fourth step, reviews the claimant's RFC and the demands of his past work. The RFC assessment is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). The ALJ found that Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b)[5] except that he can lift and/or carry 20 pounds occasionally and 10 pounds frequently; can stand and/or walk and sit six or more hours out of an eight-hour workday; can occasionally stoop and bend; and can frequently use bilateral hands. Tr. 21. The ALJ did not set forth any limitations to Plaintiff's mental RFC, stating only that his RFC determination "reflects the degree of limitation I have found in the 'paragraph B' mental function analysis" at Step 2. Plaintiff challenges the ALJ's determination that Plaintiff has no mental RFC limitations.

At step four, the ALJ must assess the physical and mental demands of the claimant's past relevant work to determine whether he is capable of performing those jobs, given the RFC found by the ALJ. *Latham v. Shalala*, 36 F.3d 482, 484 (5th Cir. 1994) (the ALJ must "directly compare the applicant's [RFC] with the physical and mental demands of [his] previous work."). Past relevant work is work that the claimant has done within the past 15 years, that was substantial

---

[5] "Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, a claimant must have the ability to do substantially all of these activities.

gainful activity, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1).

Further, in this assessment, past relevant work constitutes either "the actual demands of past work" or "'the functional demands . . . of the occupation as generally required by employers throughout the national economy.'" *Jones v. Bowen*, 829 F.2d 524, 527 n.2 (5th Cir. 1987) (quoting SSR 82-61). The ALJ may take notice of job data in the Dictionary of Occupational Titles ("DOT"), which reflects the exertional requirements of a job as performed in the national economy. *Alexander v. Astrue*, 412 F. App'x 719, 722 n.3 (5th Cir. 2011); *see also* 20 C.F.R. § 1560(2) ("a vocational expert . . . may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy."). If an individual is capable of performing the past work as he performed it or as defined by the DOT, he is not disabled.

At step four, the ALJ found that Plaintiff was capable of performing his past relevant work as a lawn foreman as generally performed, which is generally in the category of light work. He found that the job would require only occasional bending and stooping "since the job duties were supervising" and that "if the claimant used a cane in the supervisory jobs, the ability to perform the jobs would not be impacted." Tr. 26. The ALJ did not discuss the mental demands of this past work, presumably because he found no mental limitation in Plaintiff's RFC. The ALJ thus determined that Plaintiff is not disabled.

## Plaintiff's Allegations of Error

Plaintiff contends that the ALJ erred by (1) failing to ask a hypothetical question to the VE

that incorporated all of Plaintiff's limitations; (2) failing to ask the VE about Plaintiff's bilateral hearing loss and its effect on his ability to do particular work, including specifically the job of lawn care foreman; (3) failing to consider whether Plaintiff's hearing aids worked in a landscaping environment as opposed to quiet settings or to ask the VE about it; (4) failing to consider Plaintiff's pain disorder diagnosis; (5) failing to include any mental limitations resulting from Plaintiff's OSA in the RFC even though he characterized it as a severe impairment; (6) failing to properly weigh the opinion of Plaintiff's sleep specialist who confirmed Plaintiff's excessive daytime sleepiness; and (7) failing to include any mental RFC limitations at all. Plaintiff contends that the ALJ failed to apply the proper legal standards and that his decision is not supported by substantial evidence.

## Analysis

The ALJ concluded that Plaintiff is not disabled at step four because he was "capable of performing past relevant work as a lawn foreman." Tr. 26. He further noted that, "[a]t the initial hearing, the vocational expert testified that the claimant had past work as a lawn care foreman, DOT # 406.134-014, light, skilled, SVP 6." Tr. 26.[6] He stated that Plaintiff worked as a foreman from June 12, 2000 to May 23, 2012, and "[t]his work experience falls squarely within the past 15 years," "was performed long enough to learn the skills of a position with an SVP of 6," and was conceded to qualify as past relevant work by Plaintiff's counsel at the hearing. Tr. 26. The ALJ continued,

> In comparing the claimant's residual functional capacity with the physical and
> mental demands of this work, the undersigned finds that the claimant is able to

---

[6] SVP refers to "specific vocational preparation" and means "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." It may include on-the-job training. An SVP of 6 is "over 1 year up to and including 2 years" (*i.e.*, between 12 months and one day and 24 months).

perform it as generally performed. The vocational expert clarified that, as a lawn care foreman, only occasional bending and stooping is required since the job duties were supervising. Further, she testified that if the claimant used a cane in the supervisory jobs, the ability to perform the jobs would not be impacted. As noted above, the objective evidence is convincing that the claimant can perform his past relevant work as a lawn care foreman. Therefore, the undersigned finds that the claimant can perform his past relevant work as a lawn care foreman as generally performed.

Tr. 26.

The Court notes initially that the ALJ's analysis contains two significant errors. First, the record shows that Plaintiff worked as a lawn care foreman from June 12, 2000 to May 23, 2002, not 2012. Thus, this work is not "squarely within the past 15 years" but rather partially outside it, since the decision was issued in March 2016. *See* 20 C.F.R. § 404.1565(a) ("We do not usually consider that work you did 15 years or more before the time we are deciding whether you are disabled . . . .").

More importantly, the ALJ misconstrued the VE's testimony. When discussing Plaintiff's past relevant work, the VE noted that two jobs – housekeeping supervisor and food service supervisor – were a combination of two jobs. Tr. 65. Each contained a "supervisor" job and "the other half of that job" was "actual housekeeper or cleaner" or "fast food service worker." Tr. 65. The VE gave DOT job codes for each job (supervisor and actual worker) and then gave DOT job codes for Plaintiff's other jobs as inspector, "foreman in the lawn care," and "his job doing upholstery." Tr. 66. The ALJ then asked, "How would you characterize the bending and stooping requirements on those jobs?" and the VE responded, "In the supervisor role, there's very little, but when he's doing the – the actual performing of housekeeping and food service, there's frequent bending and stooping. The inspector job is frequent, as is the upholstery – well, that was medium anyway. Lawn care foreman would have just occasional bending and stooping, if he weren't

14

actually performing the lawn care." Tr. 66. Plaintiff's attorney asked, "how would the use of a cane in those positions affect the jobs as far as needing it for walking and standing?" and the VE responded, "I would say the supervisor jobs would not be affected, but the working food service and cleaning jobs would certainly be affected. The inspector job would be affected, and the foreman and upholstery jobs would, as well." Tr. 68.

Thus, the VE clearly stated that the lawn care foreman job would be affected by use of a cane, and when she referred to "supervisor jobs," she was referring to the food service supervisor and housekeeping supervisor jobs, not the foreman (a/k/a landscaping supervisor) job. The VE did not limit this to the job as actually performed by Plaintiff, but appeared to apply it to the DOT categorization as the job is generally performed. Thus, the ALJ's conclusion that the job would not be impacted by the use of a cane clearly misstates the VE's testimony and is problematic given that the ALJ appears to conclude that Plaintiff uses a cane at least sometimes and, as Plaintiff notes, his decision would not allow its use.[7]

Despite this obvious error underlying the ALJ's step-four conclusion, Plaintiff mentions the fact that the ALJ's decision necessarily precludes the use of Plaintiff's prescribed cane only twice in passing, and does not focus on the error in his points of error. Nor does Plaintiff directly challenge whether the landscaping supervisor DOT category is the appropriate category for his

---

[7] The ALJ should clarify on remand whether Plaintiff requires the use of a cane when working. The ALJ stated that Plaintiff "claimed he had used a cane for about a year, used it all the time, and nothing specific occurred that required the use of a cane. However, the objective evidence showed that he only sometimes used a cane." Tr. 22. The ALJ cites to a mental health intake note from December 9, 2014 that notes in the "other significant medical history" that Plaintiff "sometimes uses a cane." Tr. 899. But Plaintiff testified that he fell getting off a bus and his doctor prescribed a cane. Tr. 45, Tr. 93-94. Plaintiff cites a falls risk assessment conducted later than the document cited by the ALJ in December 2014 showing that Plaintiff's physician was notified that Plaintiff was "at high risk for falls." Tr. 890. Plaintiff further testified that he used a cane whenever he went out, but did not use it at home because he would have things to hold onto at home but not when he was out. Tr. 89, 92. Numerous medical records indicate that Plaintiff used a cane. *E.g.*, Tr. 951, Tr. 1339, Tr. 1328, Tr. 1149, Tr. 1138, Tr. 1010, Tr. 970.

past relevant work as a lawn care foreman, instead stating only that the ALJ did not find that Plaintiff could return to the work he last did in 2002 mowing yards in the suburbs, but that he could do the job of landscaping supervisor as it is generally performed, which Plaintiff asserts is far more mentally challenging than simple lawn care. Docket no. 18 at 2 n.4.

Rather, Plaintiff's briefing and Objections to the Magistrate Judge's report focus on his hearing loss,[8] the lack of analysis of his pain disorder, and the effects of his OSA and depression on his mental functioning and the fact that the ALJ's RFC includes no mental limitations at all. Plaintiff asserts that the ALJ's finding of perfect mental functioning at all times is not supported by substantial evidence. Plaintiff also contends that his pain disorder, which was diagnosed by Plaintiff's VA doctors and confirmed by the agency psychologist Dr. Sean Connolly, is a psychological disorder that causes him to feel pain more intensely than one would expect based on his physical condition alone. Plaintiff argues that the decision says so little about Plaintiff's pain disorder that one cannot tell whether the ALJ properly considered it at any step. And, with regard to the OSA, Plaintiff argues that the ALJ's finding that this is a severe impairment is inconsistent with his failure to include any mental limitations in his RFC finding,[9] and that he did not follow proper legal standards in weighing the opinion of Plaintiff's sleep specialist, Dr. Ingmundson. Plaintiff notes that all five physicians who have assessed Plaintiff's work-related mental functioning have opined that it is significantly impaired, while the ALJ found no mental

---

[8] The Court does not specifically address the hearing loss, given the remand on other issues, and in general agrees with the Magistrate Judge's analysis that Plaintiff has failed to demonstrate harmful error on this ground alone. However, if the ALJ again determines on remand that Plaintiff can perform his past work as a lawn care foreman, he should explain how Plaintiff's hearing loss would or would not affect his or her ability to communicate in that job. SSR 96-8p ("In assessing RFC with impairments affecting hearing or speech, the adjudicator must explain how the individual's limitations would affect his or her ability to communicate in the workplace."). Thus, the ALJ should determine whether Plaintiff's use of hearing aids means he has no communication limitations in all environments, including those with moderate noise levels, and in the specific context of the job he is considering.

[9] The Court notes that the parties cite cases that appear to go both ways on whether a finding that an impairment is severe automatically requires some limitations in the RFC, but the Court does not need to resolve this issue.

limitations. Plaintiff further asserts that the job that the ALJ found Plaintiff could do – landscaping supervisor (DOT # 406.134-014) -- has an SVP of 6, requires up to two years to master, requires "level 4" reasoning (detailed, complex, and abstract), and requires vigilance against the hazards posed by large-scale landscaping machinery.

The Court agrees that the ALJ erred, that the error was harmful, and that remand is required. As noted, the ALJ found that Plaintiff has a medically determinable impairment of depressive disorder, but found it to be nonsevere because it "does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities." Tr. 17. The ALJ performed the "special technique" for evaluating mental impairments for Plaintiff's depression, but did not apply it to Plaintiff's pain disorder, and made no further mention of Plaintiff's pain disorder beyond recognizing the diagnosis. Plaintiff was diagnosed with pain disorder related to psychological factors by his treating doctors in January 2013. *E.g.*, Tr. 483 ("psychogenic pain" and "other pain disorder related to psychological factors"); Tr. 925 (Nov. 2014 diagnosis of somatic symptom disorder with predominant pain, depressive disorder). Plaintiff notes that the ALJ gave "great weight" to the examination findings of Dr. Sean Connolly, who noted the diagnosis, but then failed to classify the pain disorder as severe or nonsevere or discuss any limitations that might result from it.[10] Plaintiff contends that it is impossible to know whether and to what degree the ALJ considered Plaintiff's pain disorder diagnosis and, if he did not consider it but should have, he might have found Plaintiff's physical RFC to be more limited and might have reached a more favorable conclusion on his credibility assessment, given that pain related to a somatoform disorder may be out of proportion with the objective medical evidence related to

---

[10] The Commissioner's brief states that Plaintiff points to no treatment for this disorder, but the same records showing the diagnosis show that Plaintiff attended weekly group psychotherapy for several weeks in January and February 2013. Tr. 483.

Plaintiff's specific conditions such as his lower back disease and knee arthritis. Docket no. 10 at 12.

The Court agrees that the ALJ's failure to expressly consider Plaintiff's pain disorder is reversible error. Although Plaintiff did not specifically list his pain disorder as a basis for his disability, the diagnosis was apparent in the record, was noted by the psychological consultant on reconsideration, and was noted by the ALJ. *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995) (the ALJ's duty to investigate and develop the facts extends to impairments that are clearly indicated on the record). The regulations require the ALJ to "develop evidence regarding the possibility of a medically determinable mental impairment when we have information to suggest that such an impairment exists, and you allege pain or other symptoms but the medical signs and laboratory findings do not substantiate any physical impairment(s) capable of producing the pain or other symptoms." 20 C.F.R. 404.1529(b). In *Latham v. Shalala*, 36 F.3d 482, 484 (5th Cir. 1994), the Fifth Circuit held that the ALJ erred by not considering whether the diagnosed somatoform disorder was responsible for the claimant's physical symptoms. Here, the ALJ did not consider the pain disorder and its possible effects on Plaintiff's pain or physical or mental limitations or on his credibility.[11]

The Court further finds reversible error concerning the ALJ's determination of Plaintiff's mental RFC. While the ALJ is solely responsible for determining a claimant's RFC, he must apply the proper legal standards and the finding must be supported by substantial evidence. The ALJ did not provide an adequate basis for rejecting the mental RFC findings of the consultative examiners,

---

[11] For example, the ALJ looked at Dr. Whitten's limitations as directed by the Appeals Council but discounted them in part because physical examination findings showed normal gait or minor tenderness. Tr. 25. But Dr. Whitten specifically noted that he recommended limitations on lifting, standing, and walking because "these cause worsening of Mr. Olivares pain." Tr. 356.

and did not adequately evaluate the opinions of Plaintiff's treating doctors on the effects of Plaintiff's OSA.

As noted by Plaintiff, all of the examining, consultative, and treating medical professionals have opined that his work-related mental functioning is limited by his mental impairments. Dr. Reddy and Dr. Wilson both found some moderate limitations in the four broad functional areas and both incorporated limitations into Plaintiff's mental RFC. The ALJ stated that he gave them "some weight," but almost completely rejected these opinions and instead gave "great weight" to the examination findings of Dr. Connolly.

While Dr. Connolly's mental status exam noted coherent thought processes, relevant thought content, general orientation to time, person, and place, it also noted that Plaintiff had a "very difficult time" with the immediate memory tasks, was unable to complete some concentration tasks, and correctly answered two out of three items assessing practical intelligence. In the functional assessment, it states generally that "sometimes [he] can follow simple instructions, if he can follow them physically" and "[s]ometimes he can complete tasks once started." Tr. 474. Dr. Connolly's report does not contain a work-related functional assessment, and his diagnosis of a GAF of 55 noted "mild difficulties in social and occupational functioning." *Id.*

Ignoring the limitations noted by Dr. Connolly and his GAF diagnosis of "mild difficulties in social and occupational functioning," the ALJ cited only to the positive exam findings, and found that the GAF rating of 55 "is consistent with the findings of intact memory, coherent thought processes, and the ability to perform tasks involving concentration." Tr. 18. The ALJ cannot "pick and choose" Dr. Connolly's exam findings to give "great weight" while ignoring his expert opinions. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) ("[T]he ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."); *Armstrong*

*v. Sullivan*, 814 F. Supp. 1364, 1373 (W.D. Tex. 1993) ("An ALJ may not "pick and choose" only that evidence which supports his decision, but must address and make specific findings regarding the supporting and conflicting evidence, the weight to give that evidence, and reasons for his or her conclusions regarding the evidence.").

Moreover, the ALJ appears to have relied primarily on notations from non-psychologists in Plaintiff's medical records for unrelated matters and on his own lay opinions to reject the expert conclusions concerning Plaintiff's limitations in the four broad functional areas, Plaintiff's limitations in the mental RFC, and limitations on Plaintiff's ability to work. Specifically, the ALJ noted that Plaintiff "had appropriate orientation, mood, affect, demeanor and dress" in August 2013, when he was evaluated by urology for a prostate cancer follow-up visit and the author of the visit note wrote the following on general notes, "well developed, well nourished, gentleman with appropriate orientation, mood, affect, demeanor and dress." Tr.1170. And the ALJ notes that "at another examination . . ., the claimant had an appropriate orientation, affect, and demeanor, and his examining clinician failed to report any signs of mood abnormalities." Tr.18 (citing Ex. B16F/83). That is listed in "physical examination" notes from March 4, 2015 as part of another urology prostate cancer follow-up conducted by a family nurse practitioner, which states in general "well developed, well nourished, gentleman with appropriate orientation, mood, affect, demeanor and dress." (The Court notes that this entry is verbatim to the urology follow up notes from 2013). Tr. 1336. These notations are not part of any psychological or RFC assessment.

The ALJ also noted that Plaintiff "has demonstrated isolated signs of a mild to moderately depressed mood including at a clinical examination in March of 2015," but noted that he "reported significant family stressors at the time of this abnormal mood and despite his impairment, he also reported that he was pursuing a more active role in his church." Tr. 18. For the March 2015

"clinical examination," the ALJ cites a social work bereavement note concerning a session "to continue bereavement therapy second to the death of his sister" when they were children. Tr. 1328. The social worker's notes indicate that Plaintiff was getting divorced at the time. Tr. 1329. Although she noted linear, coherent, and goal directed thought processes, she also noted poor to fair judgment and insight, and poor remote memory. Tr. 1328. Further, this was an appointment for bereavement counseling, not a functional assessment or evaluation. For the reported "significant family stressors at the time of this abnormal mood," the ALJ cites a psychological assessment by a psychologist in December 2014, in which he noted financial problems and his wife threatening divorce. Tr. 902. However, the psychologist included the diagnosis of depressive disorder, noted depressed mood and tangential thought process, and listed fair to poor insight. Tr. 903.

Thus, the ALJ appears to rely in large part on general statements by non-psychologists that are not focused on Plaintiff's limitations or his mental RFC, and engages in his own lay rationalization about the cause of some of Plaintiff's depressive symptoms. The ALJ points to no expert medical opinions demonstrating either no mental RFC limitations or no mental limitations on Plaintiff's ability to work, and there do not appear to be any such opinions in the record. "The principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability." *Salmond v. Berryhill*, 892 F.3d 812, 818 (5th Cir. 2018) (quoting *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000)). As in *Salmond*, all of the medical opinions indicate limitations on Plaintiff's mental work-related functioning, there is no conflicting medical opinion evidence, and the ALJ rejected the medical opinions without contradictory evidence from a medical expert. *See also Williams v. Astrue*, 355 F. App'x 828, 831 (5th Cir. 2009) (even when the ALJ is entitled to discount the weight of physicians'

opinions, there must still be evidence supporting his finding).[12]

Last, with regard to Plaintiff's OSA, the record indicates that Plaintiff was diagnosed with OSA in March 1997 after a sleep study showing severe OSA, and that he was discharged from the military in 1998 due to the OSA. Tr. 845; Tr. 857. It is undisputed that he was able to work despite having OSA. However, Plaintiff contends that the ALJ improperly rejected the opinions of his treating physician sleep specialist, Dr. Ingmundson, in 2014 and 2015 regarding the effects of his OSA on his daytime sleepiness. A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence, and a specialist's opinion is generally given more weight than that of a non-specialist. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

Dr. Ingmundson's July 2014 Sleep Apnea Disability Benefits Questionnaire for the VA states, "Patient reports a history of loud snoring, episodes of waking up snorting, choking or gasping, and excessive daytime sleepiness since 1997. Excessive daytime sleepiness since 1975." Tr. 857. The report shows that Plaintiff had several sleep studies between April 1997 and August 2012. Tr. 858. The report states that Plaintiff currently had "persistent daytime hypersomnolence" attributable to sleep apnea. Tr. 857. Under the "functional impact" section asking whether the

---

[12] In addition, the ALJ found Plaintiff's depression to be not severe, but did not conduct a separate mental RFC analysis, taking into account the mental RFC findings by the state agency consultants. Rather, he states only that "[t]he mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p)" and that his "residual functional capacity assessment reflects the degree of limitation I have found in the 'paragraph B' mental function analysis." Tr. 20. Even if that is sufficient and appropriate, which the Court does not decide, "the ALJ must still consider the impact of [a claimant's] non-severe mental impairments—either singly or in combination with other conditions—when he determines [his] RFC." *Williams v. Astrue*, 2010 WL 517590, at *8 (N.D. Tex. Feb. 11, 2010); 20 C.F.R. § 404.1545(e). While a "not severe" impairment standing alone may not significantly limit an individual's ability to do basic work activities, it may – when considered with limitations or restrictions due to other impairments – be critical to the outcome of a claim. SSR 96-8p.

sleep apnea impacted his ability to work, it states, "Obstructive sleep apnea and associated disturbed sleep may cause impairments [in] alertness and capacity for sustained vigilance." Tr. 858.

In his July 2015 progress notes based on examination after another sleep study, Dr. Ingmundson wrote, "sleep study demonstrated severe OSA, AHI = 97.4/hour, 02 desaturations to 69%. S/P UPPP w/o improvement, now on CPAP auto 12-18 cm H20. Still very sleepy." Tr. 1302. He further wrote, "Most recent sleep study June 25, 2015 ALM Sleep lab for CPAP titration. The PSG demonstrated OSA persisting in the supine sleep position . . . no significant OSA on left side" but "Pt says his shoulder pain makes it impossible to sleep on his side." Tr. 1302. The sleep study notes state that Pt "states he's currently on PAP but continues to awaken unrefreshed despite his great compliance." Tr. 1305. Dr. Ingmundson noted that "Pt has appointment pending with Dr. Paunovich/Dental for refitting of TAP appliance. He may be a candidate for hybrid therapy combining both CPAP and TAP appliance. We discussed treatment options (CPAP, CPAP + TAP device, stimulator implant). Pt is interested in stimulator implant therapy." Tr. 1302. He also said "Pt remains very symptomatic. Epworth Sleepiness Scale today = 17. His persistent daytime sleepiness caused by his sleep apnea continues to contribute to problems with maintaining alertness and vigilance, *resulting in severe occupational and functional impairment*." Tr. 1302 (emphasis added). The "assess" section says "still sleepy with CPAP 12-18 cm H20." Tr. 1302. The "plan" states, "Increase CPAP min pressure from 12 cm H20 to 15 cm H20, max pressure = 18 cm H20; Keep f/u with Dr. Paunovich/Dental for TAP appliance and possible combination CPAP/TAP therapy to reduce pressure requirements; ENT consult for evaluation for hypoglossal nerve stimulator implant; Follow up 4 months." Tr. 1302.

The ALJ assigned "little weight" to Dr. Ingmundson's 2014 opinion that Plaintiff's OSA

might cause impairments in alertness and capacity for sustained vigilance, ostensibly because the opinion was "largely conclusory" and "fails to explain the explicit objective signs and findings that would support such limitations and fails to provide any specific information as to the frequency or severity of these limitations." Tr. 25. The ALJ concluded, "As the claimant's CPAP therapy has also proven largely successful, I give little weight to this conclusory opinion." Tr. 25.

The ALJ also stated that "[t]he claimant testified that he could not think due to his sleep apnea. The evidence does not support this." Tr. 20. He noted that Plaintiff testified that he continues to feel sleepy during the day and that recent surgery to treat his OSA did not help, and that after four hours of being awake, he has to lie down and continues to have problems with his memory. Tr. 22.[13] The ALJ noted Plaintiff's 2012 sleep study and stated, incorrectly, that Plaintiff "was issued a CPAP in June 2014." Tr. 23. (In fact, the record cited by the ALJ shows that Plaintiff was issued a new face mask for his CPAP in May 2014 to attempt to address a leakage problem. Tr. 1056.)

In his analysis, the ALJ does not mention or appear to consider Dr. Ingmundson's July 2015 progress notes showing Plaintiff's "persistent daytime sleepiness caused by his sleep apnea continues to contribute to problems with maintaining alertness and vigilance, resulting in severe occupational and functional impairment" and that Dr. Ingmundson recommended further possible treatment with a hypoglossal nerve stimulator implant. Tr. 1302. The ALJ did not discuss the 2015 notes or reconcile why, if the OSA had responded well to treatment as the ALJ believed, Dr. Ingmundson was recommending further treatments. The ALJ appears to rely on Dr. Green's summary statement from over two years before Dr. Ingmundson's July 2015 notes, which state only that Plaintiff's sleep apnea was "treated with CPAP," a conclusory statement made by a

---

[13] Dr. Whitten, Plaintiff's treating physician, also opined that Plaintiff will need to lie down during the work day.

physician who is not a sleep specialist. Tr. 464. Nor did the ALJ discuss the fact that Plaintiff's OSA was helped by the CPAP when Plaintiff slept on his side, but Plaintiff indicated that he could not sleep on his side due to shoulder pain. Thus, the ALJ's conclusion that Plaintiff's OSA is treated by use of the CPAP such that this severe impairment causes no mental limitations is not supported by substantial evidence.

## Conclusion

For all these reasons, the Court agrees with Plaintiff that the ALJ's RFC determination is not supported by substantial evidence and the record cannot support the ALJ's decision. Accordingly, the Court does not accept the Magistrate Judge's recommendation to affirm. However, the Court cannot find that Plaintiff is entitled to relief, but only that the ALJ erred. Accordingly, the Court reverses and remands this case to the Commissioner for further consideration consistent with this opinion.

It is so ORDERED.

SIGNED this 23rd day of August, 2018.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE